UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 1:25-cr-20005-BB

UNITED STATES OF AMERICA

vs.

GILDA BETH ROSENBERG a/ka
GILDA ROSEMBERG PERCEZEK,

Defendant.

_____ /

## FACTUAL PROFFER FOR DEFENDANT'S CHANGE OF PLEA

The parties agree that had this case proceeded to trial, the United States (hereinafter, "the Government") would have proven the following facts beyond a reasonable doubt, which set forth a legal and factual basis for proving that GILDA ROSENBERG (hereinafter, "Defendant") did conspire to defraud the United States, to commit tax evasion in violation of 26 U.S.C. § 7201, and to willfully fail to file a Report of Foreign Bank and Financial Account Report, in violation of 31 U.S.C. §§ 5314, 5322 and 31 Code of Federal Regulations, Sections 1010.350, 1010.306(c)-(d), and 1010.840(b), all in violation of 18 U.S. § 371.

### SUMMARY

Between 2010 and 2022, the Defendant conspired with her family members to defraud the United States, evade income taxes, and fail to file Reports of Foreign Bank and Financial Accounts. As part of the conspiracy, the Defendant evaded her own income taxes, filed false tax returns, and failed to file FBARs. The family members concealed from the Internal Revenue Service ("IRS") upwards of $90 million in undeclared accounts in Andorra, Israel, Panama, and Switzerland. Some of the banks, including the former Credit Suisse AG, knew that the Defendant and her family

members were U.S. persons.  At the time that the family members divided the family's assets in 2017, and in the years following, the family members used, or attempted to use, various schemes and machinations both to covertly transfer assets to the Defendant in the United States and to conceal their ongoing tax evasion and history thereof.

## BACKGROUND

The Defendant was born and raised in Colombia.  She was a dual citizen of the United States and Colombia from birth.  The Defendant attended high school and college in the United States.  After graduating from college in 1983, she briefly returned to Colombia.  After a short time, she moved back to the United States, to the Southern District of Florida, where she has resided ever since.  That same year, the Defendant founded and continues to operate a business in the Southern District of Florida.

### *Individuals*

Relative 3 was a family member of the Defendant who was born in the United States and became a Colombian citizen.  Relative 3 died in Florida in or about June 2003.  Relative 3 owned and, until he became medically incapacitated, operated a metallurgy company headquartered in Cali, Colombia, with operations in Colombia and Ecuador and sales throughout Central and South America ("Business 1").  Business 1 generated substantial wealth for the Defendant's family.

Relative 1 was a family member of the Defendant who was born in Colombia and who became a naturalized U.S. citizen in or about December 1993.  Relative 1 inherited substantial acreage of agricultural land located in Colombia, utilized for the cultivation of sugar cane – from which she derived income each year.  Relative 1 periodically resided in the Southern District of Florida from approximately 1999 to approximately 2018, and currently resides in Colombia.

2

Relative 2 was a family member of the Defendant who was born in Colombia and was, from birth, a dual citizen of the United States and Colombia. Relative 2 attended high school and college in the United States, graduating from the latter in 1982. Following college, at various times, Relative 2 resided in the Southern District of Florida. Relative 2 worked with and, after Relative 3's illness, operated Business 1 up through 2014. In 2017, Relative 2 renounced his U.S. citizenship and became a citizen of Spain. Relative 2 currently resides in Milan, Italy.

Individual 1 was a dual citizen of Mexico and the United States. Individual 1 was a relationship manager at Credit Suisse (U.K.) Ltd. from 1998 to 2000, an employee of Credit Suisse's Representative Office in Miami from 2000 to 2008, and a relationship manager at Union Bancaire Privée in Zurich from 2010 to 2013. Individual 1 owned and operated an external asset management company in Madrid, Spain from 2013 to the present.

Individual 2 was a dual citizen of Panama and the United States who resided in the Southern District of Florida. Individual 2 was married to a relative of the Defendant, Relative 1, and Relative 2.

EAM 1 was a resident of Israel and Switzerland who worked as an external asset manager for EAM 1's own Swiss-based company, an Israel-based asset management firm, and a Gibraltar-based regulated investment company.

Attorney 1 was a business and tax attorney practicing in the Southern District of Florida whose practice focused on high net worth individuals with cross-border family and business structures.

Wealth Manager 1 was a financial advisor based in the Southern District of Florida who provided services to wealthy clients.

Return Preparer 1 was a tax return preparer who operated a business in Coral Gables, Florida. Return Preparer 1 died in 2020.

*Entities*

Andorra Bank was a bank headquartered in Andorra that provided retail, private and corporate banking services in Andorra and internationally. Andorra Bank also provided wealth management services to clients through its employees located in Panama.

Credit Suisse AG ("Credit Suisse") was a global investment bank and financial services firm founded and based in Switzerland with headquarters in Zürich. It provided private banking services to customers throughout the world. Credit Suisse merged into UBS AG ("UBS") in May 2024.

Credit Suisse (U.K.) Limited ("Credit Suisse U.K.") was a wholly owned subsidiary of Credit Suisse. It provided private banking services to customers throughout the world.

Credit Suisse Trust Limited ("Credit Suisse Trust") was, up through 2022, a wholly owned subsidiary of Credit Suisse. Credit Suisse Trust provided fiduciary services through offices in, among other places, the Bahamas, Guernsey (Channel Islands), Liechtenstein, and Singapore, as well as through employees in Switzerland.

Liechtenstein Bank was a family-owned private bank and asset management group with headquarters in the Principality of Liechtenstein.

UBS was a global investment bank and financial services firm founded and based in Switzerland with headquarters in Zürich. It provided private banking services to customers throughout the world.

Union Bancaire Privée Bank ("UBP") was a corporation organized under the laws of Switzerland with its headquarters in Geneva, Switzerland. UBP operated a financial services

4

business in Geneva, Zurich, Basel, and Lugano, Switzerland.  It primarily offered private banking and wealth management services for individual clients around the world, including U.S. citizens, legal permanent residents, and resident aliens.

Bank Leumi le Israel B.M. ("Leumi")  was a bank in Israel that provided retail, private and corporate banking services in Israel and internationally.  It provided private banking services to customers throughout the world.  Up through 2018, Bank Leumi wholly owned a fiduciary services company which provided services to customers, to include forming trusts for customers and opening and maintain accounts at Bank Leumi in the names of those trusts.

PKB Privatbank AG ("PKB") was a private bank organized under the laws of Switzerland with its headquarters in Lugano, Switzerland.  PKB has maintained offices in Bellinzona, Zurich, Geneva, and Lausanne, Switzerland.  PKB's main business unit was its private banking division which offered clients traditional private banking and asset management services.

Bank Lombard Odier & Co Ltd ("Lombard Odier") was a partner-owned private bank that was founded in 1796 and was based in Geneva, Switzerland.  It was organized under the laws of Switzerland and was part of the Lombard Odier Group, which consisted of 23 operating entities owned by LO Holding S.A., a Swiss holding company.

Panama Bank was a bank with a headquarters and operations in Panama that was founded by a family member of Individual 1.

Business 2 was a U.S. corporation controlled by Relative 2 that held a U.S. bank account.

<u>OBLIGATIONS OF U.S. TAXPAYERS</u>

United States taxpayers who had income in excess of a certain amount were obligated to file an IRS Form 1040, U.S. Individual Income Tax Return, with the IRS.  On the tax return, United States taxpayers were obligated to report their worldwide income.  Additionally, United States

taxpayers who had an interest in or signature or other authority over a financial account in a foreign country were required to disclose the existence of such account on Schedule B, Part III of their Form 1040.

A Report of Foreign Bank and Financial Accounts, FinCEN Report 114 (formerly TD F 90.22-1) ("FBAR") was required to be filed with the Financial Crimes Enforcement Network, Department of the Treasury, by each U.S. taxpayer with a financial interest in or signature authority over one or more foreign financial accounts, the aggregate value of which exceeded $10,000 at any time during the calendar year reported.

U.S. citizens who expatriated in 2017 were required to file an IRS Form 8854, Initial and Annual Expatriation Statement, and pay an expatriation tax pursuant to 26 U.S.C. §§ 877 & 877A if they had either (a) a net worth of $2 million or more on the date of their expatriation or (b) their average annual net income tax for the five years ending before the date of expatriation was more than $162,000.  Those individuals who were obligated to file a Form 8854 were subject to income tax on the net unrealized gain in their property as if the property had been sold for its fair market value on the day before their expatriation date ("mark-to-market tax").  This tax applied to most types of property interests held on the date of expatriation.

<u>FACTS</u>

In the late 1990's, Relative 3 began providing the Defendant with information about the family's foreign financial accounts.  At that time and going forward, the Defendant knew that the family members had not disclosed their ownership of these foreign financial accounts to the U.S. government, and she knew that they had not paid any taxes on the income earned from the assets in the accounts.

6

Bank records show that, no later than 1979, Relative 1 and Relative 3 (a married couple) began opening financial accounts in foreign jurisdictions into which they deposited the wealth they had earned and were earning from their business interests, including Business 1. At that time, all four family members (that is, Relative 1, Relative 2, Relative 3, and the Defendant) were named and documented as beneficial owners and/or authorized signatories on some or all of the accounts. Beginning in the 1980's, Relative 1 and Relative 2 instructed the Defendant to sign certain documents related to the foreign financial accounts.

In 1996, Relative 3 provided the Defendant with a document entitled "Accounts Worldwide." The document identified, among other things, ten financial accounts at six different financial institutions in Panama, Switzerland, and the United Kingdom with assets totaling over $57 million. Three years later, Relative 3 sent the Defendant a handwritten summary of the family's foreign financial accounts that listed eight different financial accounts at six different banks in Panama, Switzerland, and the United Kingdom. The summary recorded the Defendant as an equal and joint owner of six of those accounts with her other family members. Bank records show that, by 2013, the family members amassed approximately $100 million in assets in foreign financial accounts.

*Credit Suisse Accounts*

Bank records show that Relative 1 and Relative 3 began their banking relationship with Credit Suisse no later than 1979. Relationship managers in Switzerland, who traveled to Colombia, and employees at Credit Suisse's Representative Office in Bogota, Colombia, initially managed the accounts. In the banking paperwork, Credit Suisse documented the Defendant and her family members both as beneficial owners of the assets in the accounts and as holders of powers of attorney over the accounts. At the time of account opening, Credit Suisse identified

Relative 1 and Relative 3  as U.S. citizens and, in 1984, documented the Defendant as a U.S. citizen.  Between 1979 and 2013, the family members held no less than 15 different accounts at Credit Suisse.

Bank records show that, beginning in 1989, Relative 1 and Relative 3 began opening accounts at Credit Suisse U.K.  Between that time and 2011, the family members maintained no fewer than 14 different accounts at Credit Suisse U.K.  Bankers at Credit Suisse U.K., including Individual 1, knew that the Defendant and her family members were U.S. citizens.  There was substantial information at Credit Suisse U.K. that documented the Defendant and her family members as U.S. citizens, including: family members informed Credit Suisse UK representatives of the same; account records included references to the U.S. nationality of two family members; Credit Suisse U.K. bankers met with family members in Florida; the family members received transfers from their Credit Suisse U.K. accounts into their U.S. financial accounts; and Credit Suisse U.K. recorded in account files each family member's U.S. phone number and U.S. address.

Beginning in or around 2000, Relative 1 and Relative 2 made the Defendant generally aware that they were consolidating the family's offshore assets in accounts at Credit Suisse in Switzerland and Credit Suisse U.K. in London.  Bank records show that, as part of that effort, Relative 1 and Relative 2 removed the Defendant as beneficial owner and authorized signatory over most of the family's foreign financial accounts, as she resided in the United States and previously had disclosed the family's undeclared offshore wealth to a non-family member.

Bank records and records obtained from Credit Suisse Trust show that, as further part of the consolidation procedure, Relative 2 began a dialogue with representatives of Credit Suisse Trust regarding creating new nominee entities to conceal the family's ownership and control of

their offshore assets.   In or about 2000, Credit Suisse Trust employees recorded in contemporaneous memoranda that Relative 2 expressed his increasing concerns about attempts by U.S. and European banking authorities to obtain information about accounts held by their citizens; Relative 2 sought advice from Credit Suisse Trust as to which jurisdictions had strong bank secrecy laws and had been successful in fending off such inquiries.   In the discussions with Credit Suisse Trust, which lasted up through 2005, Relative 2 admitted that all the family members were holders of U.S. passports, and that the Defendant and the rest of the family members either resided in the U.S. or would be residing there shortly thereafter.   Ultimately, in 2005, Credit Suisse Trust created six new nominee entities for Relative 1 and Relative 2 and had accounts opened in the name of those entities at Credit Suisse and Credit Suisse UK.   Relative 1 and Relative 2 were identified as joint beneficial owners of four accounts and each was identified as the sole beneficial owner of one account.

Sometime after the death of Relative 3 in 2003, the Defendant traveled to Switzerland to attend meetings with Relative 1, Relative 2  and Credit Suisse bankers.   Bank records and records obtained from Credit Suisse Trust show that Relative 1 and Relative 2 met in Miami and Colombia with relationship managers from Credit Suisse and Credit Suisse UK as well as employees of Credit Suisse Trust.   Those records also show that Relative 1 and Relative 2 routinely met with Individual 1, who had become an employee of Credit Suisse's Representative Office in Miami. Individual 1 had assumed the day-to-day management of the Swiss accounts and provided investment advice and took instructions from Relative 1 and Relative 2 in Miami even though neither Individual 1 nor Credit Suisse was licensed to do so.

The Defendant attended some of the meetings with employees of Credit Suisse, Credit Suisse U.K. and Credit Suisse Trust, but often on a social basis.   Prior to and during such

meetings, Relative 1 would instruct the Defendant to have her Colombian passport available and instructed her to sign whatever documents the bankers asked her to sign. In later years, Relative 2 would be the one to give the Defendant directions when meeting with bankers.

Bank records show that, in 2009, Credit Suisse U.K. informed Relative 2 that it intended to close the family's remaining accounts because of, among other reasons, the connections Relative 1 and Relative 2 had to the United States. On December 8, 2010, Credit Suisse U.K. terminated the family's three remaining accounts that were beneficially owned by Relative 1 and Relative 2.

Between 2003 and 2009, the Defendant did not have any offshore accounts that she controlled. If the Defendant needed money, her family members sent her money and the Defendant would not ask where the money came from.

*UBP Accounts*

At the instruction of Relative 2, the Defendant opened an account at UBP in Zurich in 2010 which was assigned the code name "Meninas." Bank records show that the Defendant executed documents to open the Meninas account ten days after Credit Suisse U.K. informed Relative 1 and Relative 2 that the bank had terminated their accounts. The Defendant, at the instruction of Relative 2, signed account opening documents in which she falsely claimed that she was a Colombian resident and falsely denied that she was a U.S. citizen. Furthermore, the Defendant, at the instruction of Relative 2, provided UBP with a copy of her Colombian passport.

Bank records show that Relative 2 opened an account in his own name at UBP at the same time, which was code named "Neptuno." Relative 2 executed a document in which he, too, falsely denied that he was a U.S. citizen.

Bank records show that Individual 1, who was employed as a relationship manager at UBP in Zurich, aided and assisted in opening the Meninas and Neptuno accounts. The government could prove at trial that Individual 1 knew that the Defendant and Relative 2 were U.S. citizens and that Individual 1 included false information in the "Know Your Client" information maintained for both the Meninas and Neptuno accounts in order to conceal their U.S. citizenship. Bank records show that for the Meninas account, Individual 1 falsely claimed that the Defendant resided in Cali, Colombia. Individual 1 also falsely recorded in Know Your Client documents that: "[The Defendant] is not employed and her economic needs are covered from the family's trust funds. [The Defendant] is an avid fan of horse jumping and jumping is the sport that she practices often." Both statements were false. In fact, the Defendant resided and operated her own business in the United States in 2010.

Bank records show that Relative 2 funded the UBP accounts in or around February 2011 by transferring from the accounts at Credit Suisse U.K. approximately $1.5 million into each UBP account. The Defendant knew neither from where the money in the Meninas account came nor how much money was in it. Bank records show that Relative 1 and Relative 2 retained control over the Meninas account at UBP by having the Defendant sign a document that gave Relative 1 and Relative 2 authority to obtain information about the account and to provide the bank with instructions.

Although the Defendant exerted no control over the Meninas account and was uninformed as to either the source of funds or how much was deposited into the account, the Defendant considered the money in the Meninas account to be her personal assets. Between 2011 and 2017, when the Defendant closed the Meninas account, the Defendant earned $339,211 in income from the assets in the account and the value of the account grew to a high value of $1,912,717 in 2017.

Although legally obligated to do so, the Defendant never reported on her Forms 1040, U.S. Individual Income Tax Returns, either her ownership or control of the Meninas account or the income derived from the assets in the account. Further, although legally obligated to do so, the Defendant never filed an FBAR with FinCEN reporting her ownership and control of the Meninas account.

### Closure of the Credit Suisse Accounts

Bank records show that, by 2012, the family's assets at Credit Suisse exceeded $90 million. In or around 2012, the Defendant became aware that Relative 1 attempted to use some of the assets in the accounts to purchase a large quantity of physical gold. Bank records and records obtained from Credit Suisse Trust show that, in the course of addressing that request, Credit Suisse bankers and Credit Suisse Trust employees located documents in their files identifying the family members as U.S. citizens. In August 2012, these employees confronted Relative 1 regarding this citizenship issue.

At the direction of Relative 1 and Relative 2, in 2012, the Defendant signed a document in which she falsely denied that she was a U.S. citizen. The Defendant knew that the document, which is excerpted below, would be submitted to Credit Suisse.

Credit Suisse AG
(ADDRESS)

[CLIENT NAME]
[CLIENT ADDRESS]
[CIF-NO.]

Date:

Dear Sirs,

I HEREBY warrant and represent that:

1) I am **not** a United States Person as defined in in section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "Code"), and the relevant Treasury Regulations.¹ A United States Person includes any of the following individuals:
   a. United States citizens (including dual citizens);
   b. Lawful Permanent Residents ("green card holder" regardless of actual residency);
   c. Individuals satisfying the Substantial Presence Test (see Appendix 1);
   d. Non-Resident Spouse Election for jointly filing spouses;
2) **Neither** for the [CURRENT YEAR] tax year **nor** for any future tax years will I satisfy the Substantial Presence Test as defined in section 7701(b)(3) of the Code and the relevant Treasury Regulations (see Appendix 1 for definition);
3) I have been and will in the future be present in the US on just a temporary basis (i.e., for stay or stays lasting no longer than 4 calendar months per year);
4) If any of the representations made in this letter change, I will notify Credit Suisse AG within 30 days.

I HEREBY covenant to indemnify Credit Suisse AG and its employees, agents and affiliates (the "Relevant Parties") and to hold the Relevant Parties harmless from and against all claims and actions (whether instituted by any taxing or other authority or person) as well as but not limited to all damages, penalties, liabilities, disadvantages including all costs and expenses related in whatever manner to the warranties and representations I have made in this letter.

Kind Regards,

_____
Print

_____
Date & Place

Bank records and records obtained from Credit Suisse Trust show that, in an attempt to persuade Credit Suisse that they were not U.S. citizens, Relative 1 and Relative 2 provided Credit Suisse with the false document signed by the Defendant, as well as similar false declarations that they signed. Credit Suisse did not accept these false representations and expressed its intention to terminate the accounts.

13

The Defendant was aware that Relative 1 and Relative 2 began searching for other foreign banks where they could transfer their assets.  The government could prove at trial that Relative 1 and Relative 2 began meeting with fiduciaries, asset managers, and insurance companies for solutions through which they could continue to conceal their offshore assets.  In particular, they sought the advice of former Credit Suisse bankers, including Individual 1, each of whom knew that Relative 1 and Relative 2 were U.S. persons, to discuss transferring their assets to other foreign financial institutions.  Bank records and records obtained from Credit Suisse Trust show that, ultimately, Relative 1 and Relative 2 utilized the services of EAM 1 to close the accounts at Credit Suisse and transfer the assets to other foreign financial institutions.

Bank records and records obtained from Credit Suisse Trust show that, between November 2012 and May 2013, Relative 1 and Relative 2, with the assistance of EAM 1, closed the Credit Suisse accounts and transferred assets to the following destinations:

- Approximately $50,906,000 to an account at PKB in Switzerland held in the name of Dicoma Enterprises, a Panamanian nominee entity that was beneficially owned by Relative 1;

- Approximately $30,405,000 to an account at Bank Leumi in Israel opened in the name of a fiduciary company then owned by Bank Leumi in trust for Relative 1 and Relative 2 and managed by EAM 1;

- Approximately $8,941,000 to an account at Andorra Bank held in the name of Consorcio Baldoria, a nominee Panamanian entity, beneficially owned by the Defendant, Relative 1, and Relative 2; and

- Approximately $3,061,000 to Relative 2's Neptuno account at UBP.

*Andorra Bank Accounts*

In February 2013, the Defendant and, according to banks records, Relative 1, and Relative 2 executed documents to open two accounts at Andorra Bank held in the names of nominee Panamanian entities, Consorcio Baldoria and Corporacion Nimitz S.A., which had been formed in November 2012. The Defendant, Relative 1, and Relative 2 were documented as the beneficial owners of the assets in the accounts. Bank records show that they each provided Andorra Bank with their Colombian identity documents and not their U.S. passports. Further, the Defendant signed documents in which she falsely claimed that she resided in Colombia and provided the bank with a utility bill in her name for an apartment in Colombia to corroborate that false claim. Bank records show that, although the Defendant, in theory, could exercise authority over the accounts by signing an instruction jointly with either Relative 1 or Relative 2, she never did so. Instead, the forms that Relative 2 directed the Defendant to sign provided Relative 2 with unilateral control over the accounts.

Bank records show that Relative 2 funded the Corporacion Nimitz account in February 2013 with a transfer of €1,870,600 from his Neptuno account at UBP. Relative 1 and Relative 2 funded the Consorcio Baldoria account in April 2013 with transfers totaling $8,941,000 from the family's Credit Suisse accounts. The assets deposited into the Consorcio Baldoria and Corporacion Nimitz accounts largely remained there through closing, with the exception of a transfer of $500,000 from the Corporacion Nimitz account to an account held in Relative 2's name in Panama in July 2013.

A rift between the family members began in 2014 that lasted through 2017. During that time, there was minimal communication between the Defendant and Relative 2. However, during this period, the Defendant and Relative 1 met in Miami and Argentina with EAM 1, who had been

introduced to them by Relative 2, in fruitless attempts to obtain information about the accounts and funds to support Relative 1.

*Division of the Family's Assets*

In or about 2017, the Defendant and her family members began negotiating over dividing the family's assets. As part of the process, documents show that the family members openly discussed their "historic US tax position," which was coded language for the family members' decades-long intentional failure to report on FBARs their ownership and control of the foreign accounts that they owned in, among other places, Andorra, Israel, and Switzerland, as well as their evasion of tax on the accounts' income. In structuring the division of assets, the Defendant and her family members sought to continue to evade U.S. taxation as well as taxation in other countries. In their communications, the family members referred to their U.S. citizenship by referencing their possession of a "blue book," which was code for the color of their U.S. passport books, and strategized as to whether to renounce that U.S. citizenship.

The family members agreed that they would divide the family's assets between the Defendant and Relative 2, and would do so in advance of Relative 1's passing. As part of the plan, Relative 2 elected to renounce his U.S. citizenship and to falsely claim that he was not a "covered expatriate" in order to evade the U.S. exit tax. In accordance with this plan, the Defendant would receive agricultural land in Colombia, operating companies in Colombia and Ecuador, real property in Colombia, a condominium in Florida owned by Relative 1, and approximately $15 million of the assets in the family's undeclared foreign financial accounts. However, the Defendant received only bare title to the agricultural land and operating companies while Relative 1 retained the right during her lifetime to the income those assets generated. The Defendant and

16

Relative 2 agreed to deposit $1 million in a foreign financial account for Relative 1's needs. Relative 2 would receive the remainder of the family's offshore bankable assets.

*Closure of the Meninas Account at UBP*

On or about October 23, 2017, the Defendant flew from Miami to Madrid, Spain. On October 25, 2017, at Relative 2's direction, the Defendant met with bankers at UBP to discuss, among other issues, how fast the bank could liquidate into cash the assets held in the Meninas account. A week later, at Relative 2's direction, the Defendant directed UBP to close the account. Rather than transfer funds to the Defendant's accounts in United States, which could arouse suspicion, Relative 2 instructed the Defendant to transfer the assets to an account in Panama owned by a business associate of Relative 1. Further, he directed the Defendant to falsely inform the bank that she was using the funds to purchase agricultural land in Colombia. The Defendant took both actions.

*$1 Million Set Aside for Relative 1*

As part of the agreement to divide the family's assets, the Defendant and Relative 2 agreed to place $1 million in a foreign financial account for the benefit of Relative 1. Bank records show that on or about October 30, 2017, Relative 2 executed documents to open an account at Liechtenstein Bank in his own name. He did so with the assistance of an external asset manager in Switzerland who had been the Credit Suisse relationship manager overseeing the family's accounts in July 2012 when Relative 1 attempted to purchase physical gold, triggering Credit Suisse's examination of various records showing that the Defendant and her family members were U.S. citizens. In April 2019, as part of the agreement to provide Relative 1 with $1 million, Relative 2 transferred approximately $1 million in U.S. Treasury bills into the account. Relative 2 sent a text to the Defendant providing her with the account information and confirming that that

he had opened and funded the account in fulfillment of the family's agreement.  The account remained open until January 2020, when Relative 2 transferred the assets to his own account at Lombard Odier.

*Relative 1 and the Defendant "Donate" the Family's Offshore Assets to Relative 2*

Relative 2 directed Relative 1 and the Defendant to travel to Madrid, Spain in November 2017 to execute documents to "donate" to Relative 2 the family's assets in the undeclared foreign financial accounts after Relative 2 renounced his U.S. citizenship, in accordance with their plan to continue to evade U.S. taxation.  The Defendant and Relative 1 both purported to "donate" to Relative 2 the family's assets in the undeclared foreign financial accounts, even though bank records showed that Relative 2 was already documented as the joint beneficial owner of a large portion of the assets in those undeclared foreign financial accounts.  In the documents, the Defendant and Relative 1  represented themselves as Colombian citizens residing in Colombia.

*Relative 2 Takes Control of the Family's Offshore Assets*

Bank records show that, beginning in November 2017, after Relative 2 expatriated from the United States, Relative 1 and Relative 2 closed the family's existing foreign financial accounts. They transferred assets totaling $83 million from the accounts at PKB and Bank Leumi to an account held in Relative 2's name at Lombard Odier.  Further, Relative 2 closed the accounts at Andorra Bank and transferred out a total of $9 million, including: €7,540,849 to an account held in his name at a bank in Spain and over $819,330 to an account in Colombia held in the name of Business 1.

*Relative 2 Employs Various Schemes to Covertly Transfer Assets to the Defendant*

Although the family members agreed that the Defendant ultimately would receive approximately $15 million of the family's assets in the foreign financial accounts, Relative 2 generally refused to wire funds directly to the Defendant in the United States. Relative 2's refusal in this regard was based on his expressed concern that the IRS would discover the family's decades of tax evasion and Relative 2's failure to disclose the offshore assets prior to and as part of his expatriation. As a result, beginning in February 2018, Relative 2 employed a variety of ruses and machinations to transfer covertly a portion of the assets owed to the Defendant:

- Bank records show that, on or about February 27, 2018, Relative 2 wired €350,000 ($424,500) from one of his accounts in Spain to an account in Panama controlled by Individual 2. That same day, the Defendant and Individual 2 signed a promissory note that made it appear as if the Defendant had lent the money to Individual 2. It was not a loan. Instead, the Defendant paid Individual 2 a 4% fee for receiving the funds and transferring them to her. Individual 2 paid the Defendant in the form of six bank checks drawn on the correspondent account of Panama Bank.

- Bank records show that, in March 2018, Relative 2 transferred €300,000 (approximately $366,000) from the Corpación Nimitz account at Andorra Bank to a financial account in Switzerland held by an attorney practicing in Italy. In April 2018, that attorney transferred $350,000 to one of the Defendant's domestic accounts. At the Defendant's direction, the wire detail included false information that the transfer was related to the settlement of a civil lawsuit, which had been entered into by the Defendant's company in November 2017 and which had been

fully paid at that time. The Defendant paid a 4% fee, roughly $14,600, for the attorney's role in concealing and disguising the origin of the funds.

- Bank records show that, on or about June 11, 2018, Relative 2 wired €150,000 ($175,300) to an account in Panama controlled by Individual 2. These funds were distributed as follows:

  o On or about August 1, 2018, the Defendant and Individual 2 signed an agreement stating that the Defendant would invest $45,000 into a company owned by Individual 2. Individual 2 kept the $45,000.

  o On or about August 8, 2018, the Defendant and Individual 2 signed an agreement stating that Individual 2 had received $130,000 from the Defendant and that, upon request, Individual 2 would pay the Defendant the same amount, less a 4% fee. Individual 2 kept the 4% fee.

  o Individual 2 was allowed to keep no less than an additional $15,000 for, among other things, expenses incurred traveling to Switzerland and Panama in order to facilitate the covert transfer of funds from Relative 2 to the Defendant.

  o Individual 2 obtained two bank checks totaling approximately $62,000 drawn on Panama Bank's correspondent account that were made payable and given to a contractor performing work for the Defendant.

  o Individual 2 wired approximately $44,380 from the domestic account held in the name of a domestic entity that Individual 2 controlled to a domestic account of an entity controlled by the Defendant.

- Bank records show that Relative 2 used an account at a bank in Portugal that appeared to belong to an operating company in order to conceal the origin of the funds that he sent to the United States. Between April 2018 and December 2020, Relative 2 caused to be transferred over $460,000 through the Portuguese account to the Defendant's domestic accounts. Bank records show that Relative 2 also used the operating company account in Portugal to conceal the origin of transfers (totaling more than $167,000) to domestic accounts held in Relative 1's name and of transfers (totaling over $178,000) to a domestic account of a nominee entity Relative 2 controlled, which funds were used to pay the credit card bills of Relative 1 and Relative 2.

At times, Relative 2 used WhatsApp to notify the Defendant that he had transferred funds to a third party for the benefit of the Defendant. The Defendant provided that information to one of her employees who tracked each payment made by Relative 2, the intermediate recipient, the exchange rate, the fees deducted by the middle person(s), and the net amount and recipient of the funds in the United States, be that the Defendant or a third party for the benefit of the Defendant.

*Relative 2 Refuses to Transfer the Bulk of the Assets to the Defendant*

By late 2019, Relative 2 held in his foreign financial accounts approximately $12 million that belonged to the Defendant; he continued to refuse to transfer the bulk of offshore assets into the United States. The Defendant enlisted the assistance of Attorney 1, Wealth Manager 1, and Return Preparer 1 in an attempt to persuade Relative 2 to provide her with her agreed-to share of the family's offshore undeclared assets. The Defendant and her advisors proposed two schemes to transfer assets into the United States in a manner that would conceal their origin:

- Relative 2 would transfer the money to an account in Panama held in the name of a Panamanian corporation and the corporation would then "gift" the assets to the Defendant; or

- Relative 2 would participate in a "back to back" loan. That is, Relative 2 would deposit the Defendant's assets into an account at a foreign financial institution where he would be identified as the beneficial owner of the assets. The Defendant would then obtain a "loan" from the foreign financial institution that would be secured by the assets in the account held by Relative 2. As the Defendant would have no intent to repay the "debt," the foreign financial institution would take the assets in the account created by Relative 2 to satisfy the "loan."

Relative 2 refused to transfer the funds to the Defendant pursuant to either one of these schemes. He also attempted to dissuade the Defendant from discussing the family's untaxed assets by warning her: "Keep talking about this with third parties, and sooner or later you'll have to face the consequences." The Defendant and her family members, as well as the Defendant's advisors, knew that the family members had evaded taxes by failing to report their income and foreign financial assets. In communications between the Defendant and her advisors, they repeatedly discussed: (a) the risk that the IRS could discover the family's offshore assets; and (b) the risk that Relative 2 would refuse to transfer the bulk of the Defendant's offshore assets until the statute of limitations barred prosecution for his tax crimes.

In order to placate the Defendant, Relative 2 transferred approximately €243,173 ($261,810) to a foreign financial account controlled by Individual 2 for the benefit of the Defendant. The Defendant paid a 10% fee, or $26,181, to conceal the origin of the funds. As

such, in February and March 2020 the Defendant received into her domestic personal account two wires totaling $235,629 from a foreign financial account in Panama controlled by Individual 2.

Instead of transferring the entirety of the Defendant's assets to the United States, Relative 2, at the direction of Relative 1, and without consulting the Defendant, placed the assets into an "insurance wrapper" account at Lombard Odier. Bank records show that, in or about March 2019, Relative 2 purchased an "insurance wrapper," or an investment account, at Lombard Odier around which was wrapped a life insurance policy. Relative 2 identified himself as the owner, Relative 1 as the insured, and the Defendant as the beneficiary. Relative 2 sent the Defendant a bank statement for the insurance wrapper account showing that the assets were valued at approximately $12 million.

The Defendant came to understand that insurance wrappers were vehicles for tax evasion. On February 19, 2020, Wealth Manager 1 sent the Defendant a link to a blog posting written by an attorney entitled "Swiss Insurance Wrappers & Whistleblower Rewards." In that article, the attorney discussed the recent guilty plea entered by a U.S. taxpayer who concealed over $5 million in undeclared assets in an insurance wrapper and urged those who knew of such schemes to contact the attorney for information regarding the IRS's Whistleblower Program, which offered rewards of up to 30% of whatever the IRS collected, including taxes, interest, and penalties.

In March 2020, the Defendant raised with Wealth Manager 1 the possibility of asking Relative 2 to transfer to her $1 million of her assets, disguised as a loan. The Defendant sought to exploit the COVID epidemic and attendant shutdowns, theorizing that bankers would be less likely to scrutinize such a transaction. Relative 2 did not agree to make such a loan. However, in November 2021, Relative 2 transferred €1,299,000 ($1,423,550) from his account at

Lombard Odier to a domestic account held by a revocable trust controlled by the Defendant as a means of transferring a portion of the Defendant's undeclared assets into the United States.

*The Defendant and Her Family Members React to the Criminal Investigation*

In May 2022, the Defendant and her family members became aware of the government's investigation of their efforts to conceal their assets and income from the IRS. The government can prove at trial that, at or about the same time, Relative 2 removed the Defendant as beneficiary of the insurance policies in an attempt to erase her connection to her undeclared assets.

TAX LOSS

The Defendant consistently filed false Forms 1040, U.S. Individual Income Tax Returns. Between 2010 and 2017, the Defendant failed to report the income earned from the assets in the account that she concealed at UBP.

The Defendant conspired with Relative 1 and Relative 2 to willfully evade the assessment of her own individual income taxes and the taxes of Relative 1 and Relative 2 (up through his expatriation). For tax years 2009 through 2017 the unreported income totaled $5,501,521.31 and the tax due and owing was $1,927,342:

| Year | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|
| Unreported Income | $216,925.66 | $1,164,115 | $959,230.59 | $755,718.61 |
| Tax Due and Owing | $71,726 | $381,812 | $308,133 | $254,638 |

| Year | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| Unreported Income | $537,646.30 | $323,862.35 | $337,031.42 | $318,106.23 |
| Tax Due and Owing | $188,258 | $121,892 | $117,356 | $123,797 |

| Year | 2017 |
|---|---|
| Unreported Income | $888,885.15 |
| Tax Due and Owing | $359,730 |

## FOREIGN BANK ACCOUNT REPORTING

The Defendant willfully failed to file FBARs reporting foreign financial accounts that she owned or had a financial interest in for calendar years 2010 through 2021. The Defendant failed to report the following accounts: the Meninas account at UBP, which was open from 2010 through 2017; the Consorcio Baldoria and Corporacion Nimitz accounts at Andorra Bank, which were open from 2010 through 2017; and the insurance wrapper account at Lombard Odier, which was open from 2018 through at least 2021.

The Defendant conspired with Relative 1 and Relative 2 to fail to file Reports of Foreign Bank and Financial Account for the years 2010 through 2021. In 2016, the aggregate high value of the unreported foreign financial accounts in Andorra, Spain, Israel, and Switzerland was greater than $65,000,000 and less than $150,000,000.

## STATUTORY ELEMENTS

The elements of the crime of **Conspiracy to Defraud, 18 U.S.C. §371** , are:

First:       Two or more people in some way agreed to try to accomplish a shared and unlawful plan to defraud the United States or one of its agencies;

Second:    The Defendant knew the unlawful purpose of the plan and willfully joined in it;

Third:      During the conspiracy, one of the conspirators knowingly engaged in at least one overt act

Fourth:    The overt act was knowingly committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

The elements of the crime of **Attempting to Evade or Defeat Tax** under the Internal Revenue laws, **26 U.S.C. §7201**, are:

First:   That the Defendant committed an affirmative act or acts constituting an attempt to evade or defeat a tax or the payment thereof;

Second:   An additional tax was due and owing; and

Third:   The Defendant acted willfully.

The elements of the crime of **Willful Failure to File a Report of Foreign Bank or Financial Account** under the Bank Secrecy Act, **31 U.S.C. § § 5314, 5322**, are:

First:   The Defendant was a U.S. person, that is, a U.S. citizen or resident alien, or an entity organized under Federal or state law;

Second:   The Defendant had a financial interest in, or signature or other authority over, a bank, securities, or other financial account in a foreign country;

Third:   The aggregate value of all such accounts exceeded $10,000 at any time during the calendar year;

Fourth:   The Defendant failed to report such account on FinCEN Form 114, a Report of Foreign Bank and Financial Accounts, by the annual deadline date (generally June 30th in the year following the reportable year); and

Fifth:   The Defendant willfully failed to report the account.

Sixth:   While violating another law of the United States or as a part of a pattern of illegal activity involving more than $100,000 in a 12-month period (for the aggravated section pursuant to 5322(b)).

Defendant GILDA ROSENBERG states that she has consulted with her attorneys and has fully discussed with her attorneys the evidence against her and any possible defenses.  She further admits that the facts described above are true; that they support a finding that the elements of the offense conspiring to defraud the United States, in violation of Title 18, United States Code, Section 371, and of conspiring to commit the substantive offenses of attempting to evade or defeat a tax for tax years 2009 through 2017, in violation of Title 26, United States Code, Section 7201, and willful failure to file a report of foreign bank and financial account for 2010 through 2021, in violation of Title 31, United States Code, Sections 5314, 5322; have been met; that they support a factual basis for the entry of her plea of guilty to count 1 of the Information; and that she is in fact guilty of that crime.

HAYDEN P. O'BYRNE
UNITED STATES ATTORNEY

KAREN E. KELLY
ACTING DEPUTY ASSISTANT
GENERAL FOR CRIMINAL
MATTERS
TAX DIVISION

ANA MARIA MARTINEZ
ASSISTANT UNITED STATES ATTORNEY

MARK F. DALY
STAN OKULA
SENIOR LITIGATION COUNSEL

MARISSA R. BRODNEY
TRIAL ATTORNEY
TAX DIVISION

VICTOR A. JARAMILLO
JOAN SILVERSTEIN
BRUCE A. ZIMET
ATTORNEYS FOR GILDA BETH ROSENBERG

GILDA BETH ROSENBERG
DEFENDANT